UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ROBERT J. PROFUMO, )
)
    Plaintiff, )
)
vs. ) Case No. 4:12-CV-132 (CEJ)
)
ALLIANCE FOR COMMUNITY HEALTH, )
d/b/a Molina Healthcare of )
Missouri, Inc., )
)
    Defendant. )

## MEMORANDUM AND ORDER

This matter is before the Court on defendant's motion for summary judgment. Plaintiff has filed a response in opposition to the motion and the issues are fully briefed.

Plaintiff Robert J. Profumo was the chief medical officer (CMO) for defendant Alliance for Community Health, doing business as Molina Healthcare of Missouri, Inc. (Molina Missouri), until his termination on July 5, 2011. Plaintiff alleges that defendant wrongfully denied him severance benefits. He brings a claim for breach of contract. He asserts in the alternative that the severance benefits constitute an employee welfare plan covered by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 *et seq.* He brings a claim for benefits under § 1132(a)(1)(B) and a claim for failure to provide plan information upon request under § 1132(c)(1)(B).

### I.    Background

As required by the local rules of this district, defendant submitted a statement of undisputed material facts and plaintiff submitted a response identifying those material facts "as to which [he] contends a genuine issue exists." L.R. E.D. Mo.

4.01(E). In response to more than 30 of defendant's factual statements, plaintiff states in part:

> This is not a material fact because this conduct/incident did not cause Molina to terminate Dr. Profumo's employment. Following this conduct and receiving this warning, <u>in December of 2011</u> Dr. Profumo received accolades from Molina for going above and beyond the call of duty and assuming key duties from the former Chief Operating Officer of Molina's Missouri operation. . .

Doc. #58 at ¶¶ 17, 18, 19, *et alia* (emphasis added). In most instances, this paragraph is unresponsive to the fact being asserted and thus fails to assist the Court in understanding the factual basis of the parties' dispute. More troubling, the underlined language is incorrect: the "accolades" to which plaintiff refers were issued in December <u>2010</u>, months before some of the "conduct [or] incident[s]." Id. at ¶¶ 42-50. Dec. 13, 2010 Memo [Doc. #56-7]. The Court does not believe that plaintiff is attempting to manufacture a dispute of material fact for the purposes of defeating summary judgment, but it is not the Court's responsibility to check the parties' statements of fact against the record to determine their accuracy. As a consequence of the error, the Court has disregarded the entire paragraph where it appears in plaintiff's response to defendant's statement of undisputed material facts.

Defendant Molina Missouri is part of Molina Healthcare, Inc., (Molina Inc.), a multi-state healthcare organization that delivers government-sponsored healthcare programs to low-income individuals. In September 2007, defendant acquired Community Care Plus. Plaintiff was the CMO for Community Care Plus and remained in that position after defendant took over.

Plaintiff received written warnings on March 2, 2010, and May 3, 2010. [Docs. #49-5 and #49-6]. The first warning was issued after an internal audit disclosed that plaintiff improperly rejected an appeal decision overturning his initial denial of

coverage. Plaintiff's action violated accreditation requirements and state and federal regulations. The second warning was issued after plaintiff executed an agreement with a new consultant without obtaining proper corporate review. Plaintiff testified at deposition that he was unaware that defendant's hiring procedures had changed and that he had obtained the plan president's authorization to hire the consultant. Pl. Dep. at 110-12 [Doc. #49-1].

Kristen Cerf is an associate general counsel for Molina Inc. She states in affidavit that she learned in February and March 2011 that at least 11% of Molina Missouri's providers were permitted to carry less than the required levels of insurance. [Doc. #51 at ¶6]. According to Ms. Cerf, plaintiff authorized lower insurance levels for rural providers without consulting the legal or corporate credentialing departments. Id. at ¶7. Plaintiff testified that, at Ms. Cerf's request, he investigated what other healthcare networks required of rural providers. He informed Ms. Cerf that defendant was "in line with" other networks, and she ultimately approved the practice. Pl. Dep. at 154-55.

In December 2010, defendant contracted with Comprehensive Behavioral Care (CompCare) to provide behavioral health services to its Missouri Medicaid members. Plaintiff was the chair of the oversight committee established to ensure that CompCare was compliant with its contractual obligations. On June 3, 2011, plaintiff told Ms. Cerf that CompCare had not adequately developed its provider network, and he asked her to review a letter he intended to send to CompCare. Cerf. Aff. ¶8. Plaintiff also told her that state regulators were scheduled to complete an onsite audit of Molina's behavioral health services on June 15 and 16, 2011. Id. at ¶9. Ms. Cerf asked plaintiff whether he had any concerns about the audit in light of CompCare's inadequate

network.  Plaintiff responded that he did not foresee any issues because other health plans had similar difficulties with rural counties.  Id. at ¶10.

At the time of these events, Tina Gallagher was the president of Molina Missouri. According to Ms. Cerf, Ms. Gallagher wanted to conduct a "mock audit" to identify areas of concern.  Plaintiff objected that there was not enough time to complete this process and that the results would not be helpful.  Id. at ¶12.  Ms. Cerf states that it became apparent in the days before the audit that plaintiff and his department were "egregiously under-prepared, were not appropriately responsive, and that CompCare was in breach of its Agreement with Molina Missouri, and Molina Missouri was in turn in breach of the State Contract."  Id. at ¶13.

Before the audit, Ms. Cerf and Ms. Gallagher informed the staff, in writing, that Molina Missouri would accept full responsibility for the failure to comply with the State behavioral-health contract.  Id. at ¶14.  Despite this instruction, and without prior notice to Ms. Cerf, plaintiff gave the auditors his own written statement.  Stmt. [Doc. #49-7].  Plaintiff told the auditors that CompCare had performed well on a pre-contract assessment, with the exception of network adequacy for which a "stringent corrective action plan" was developed.  He acknowledged that he had recently learned that CompCare was not adequately performing its case management obligations -- this failure was "completely unacceptable" and was addressed with "the highest levels of CompCare."  Otherwise, "CompCare has been found to be compliant with all other contractual requirements."  Kathie Mancini, Molina Inc.'s Regional Vice President of Healthplan Operations, testified at deposition that the audit results contradicted plaintiff's representations to the auditors.  Mancini Dep. Tr. at 35-36 [Doc. #62-2]. See also Notice of Breach of Contract dated June 15, 2011 (identifying material breach

of contract with respect to CompCare's network adequacy, case management, record keeping, and staffing) [Doc. #57-4].

The audit team was led by Ian McCaslin, M.D., director of Missouri's Medicaid program. Plaintiff acknowledged at deposition that the audit went poorly. Pl. Dep. at 138. For example, plaintiff "lost his temper" and "raised his voice" with the CompCare representative. Id. at 80-81. Additionally, in an exit interview on June 16, the state regulators expressed "their extreme dissatisfaction and frustration with Molina Missouri's and CompCare's performance," for which they held Molina Missouri solely responsible. Cerf Supp. Aff. at ¶¶ 8-9 [Doc. #69-1]. The state regulators imposed a corrective action plan that required defendant to complete a weekly manual review of all cases, files, and clinical guidelines, to begin immediately. Mancini Aff. at ¶11 [Doc. #50]; Pl. Dep. at 139. Defendant was required to hire additional staff to comply with these requirements. Mancini Aff. at ¶11. The state also assessed fines of $90,000 per month over a three-month period. Id. at 12.

In June 2011, Tina Gallagher drafted a "Final Written Warning" designed to notify plaintiff of alleged performance deficiencies. See e-mail chain dated June 22 and 23, 2011 and attachment [Doc. #57-3]. The draft warning focused on events preceding the audit, including plaintiff's lack of concern regarding CompCare's inadequate network, his resistance to a "mock audit," and his inability to state when the audit would occur. The draft warning stated:

> The disregard for the basic oversight of [CompCare] and the negligence in allowing [it] to disregard [its] obligations to both Molina and the State of Missouri is highly disturbing. We expect to see immediate and sustained improvement in your performance and ultimately accepting accountability for the lack of follow up and basic oversight which are pivotal to being successful in your role.

Id. The draft warning anticipated a final review of plaintiff's performance 45 days after it was issued.

The Final Written Warning was never issued. On June 27, 2011, Ms. Gallagher and Ms. Mancini each contacted employees in Molina Inc.'s human relations department "to discuss Dr. Profumo." See email chain dated June 27 and 28, 2011 [Doc. #56-9]. According to an e-mail authored by Abel Saborit, Jr., Molina Missouri's human relations manager,

> [T]hey were going to do the route of a final warning but new information came to Tina and Kathie's attention . . . [T]he head of the State of Missouri Medicaid [Dr. McCaslin] said that he refuses to work with [plaintiff]."

Id.

On July 5, 2011, plaintiff was called to a meeting with Tina Gallagher and Abel Saborit. Kathie Mancini attended by telephone and Kristen Cerf attended by videoconference. Timeline [Doc. #56-6]; Cerf Aff. at ¶17. A security guard was present at the meeting as a precaution. Id. at ¶18. Plaintiff was informed that his employment was terminated for cause as a result of (a) his failure to properly oversee the CompCare contract; (b) his failure to ensure compliance with policies, procedures, and contractual obligations; (c) Molina Missouri's failure to provide appropriate behavioral health services; (d) the state's dissatisfaction with his response to the post-audit corrective action plan; (e) his failure to understand the seriousness of the noncompliance and take timely action; and (f) his inappropriate treatment of CompCare's vice president who complained that she felt threatened by plaintiff. Id. at ¶19.

Additional facts will be included as necessary to address the issues.

II. **Legal Standard**

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered if the moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment the court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. AgriStor Leasing v. Farrow, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations of his pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. United of Omaha Life Ins. Co. v. Honea, 458 F.3d 788, 791 (8th Cir. 2006) (quoting Fed. R. Civ. P. 56(e)). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corporation v. Catrett, 477 U.S. 317, 322 (1986).

### III. Discussion

Plaintiff asserts that he is entitled to severance benefits and brings alternative claims under contract law and ERISA.

#### A. Breach of Contract Claim

The parties agree that Missouri law applies to plaintiff's breach of contract claim. Summary judgment is appropriate in a contract case "where the language of the contract is clear and unambiguous, such that the meaning of the portion of the contract in issue is so apparent that it may be determined from the four corners of the document." Missouri Consol. Health Care Plan v. BlueCross BlueShield of Missouri, 985 S.W.2d 903, 908 (Mo. Ct. App. 1999) (internal quotations and citations omitted).

Plaintiff's claim to severance benefits arises from a provision in an "offer letter" from Molina Inc. dated September 7, 2007. [Doc. #49-3]. The letter specified that plaintiff was an "at will" employee and offered severance payments in the event that his employment was terminated without cause. An amendment on December 22, 2010 reiterated that plaintiff's employment was "at will" and provided that he would be entitled to severance benefits "in the event that the Company elects to terminate your employment without cause . . ." Severance benefits, if applicable, would be paid in 18 monthly installments equal to the sum of plaintiff's monthly base pay plus 1.5 times the monthly premium for his medical benefits. Addendum [Doc. #49-4].

Plaintiff first argues that an ambiguity arises because the documents do not define "termination without cause." Courts must give words used in the contract "their plain, ordinary meaning." Care Ctr. of Kansas City v. Horton, 173 S.W.3d 353, 355 (Mo. Ct. App. 2005). Whether a contract is ambiguous is a question of law. Klonoski v. Cardiovascular Consultants of Cape Girardeau, Inc., 171 S.W.3d 70, 72 (Mo. Ct. App. 2005) (citation omitted). A contract is ambiguous only if its terms are reasonably open to more than one meaning, or the meaning of the language used is uncertain. Horton, 173 S.W.3d at 355. A contract provision is not ambiguous merely because the parties disagree over its meaning. Id.

The absence of a definition of "termination without cause" does not render the parties' contract ambiguous because it has a "natural, ordinary and common-sense meaning." Blase v. City of Neosho, No. 10-003311-CV-S-JTM, 2012 WL 5362249 at *3 (W.D. Mo. Oct. 30, 2012). "To be fired 'without cause' means that an employer gave no reason or justification for the termination." Id. (citation omitted); see also Black's Law Dictionary (9th ed. 2009) (dismissal "for cause" defined as dismissal "for a reason that the law or public policy has recognized as sufficient to warrant an employee's removal."). Here, defendant provided plaintiff with several reasons for his termination, including his failure to ensure CompCare's compliance with contractual and regulatory requirements, resulting in the imposition of a corrective action plan and fines.

Plaintiff insists that defendant must show that his termination was based on his "performance." See City of Beverly Hills v. Village of Velda, 925 S.W.2d 474, 476 (Mo. Ct. App. 1996) (in context of services contract, termination "for cause" is a "performance-based standard"). This is a distinction without a difference -- the standard that plaintiff advocates requires, "at a minimum, [that] defendant communicate dissatisfaction with plaintiff's performance of [his] duties and obligations prior to or simultaneous with defendant's notice of termination." Id. Defendant enumerated to plaintiff several areas in which it determined that plaintiff had failed to perform his obligations at the time of his termination.

Plaintiff argues that the "real" reason defendant terminated his employment was to appease an angry state regulator. In support, plaintiff asserts that the only event that occurred between June 22, 2011, when the draft Final Written Warning was being discussed, and July 5, 2011, the date of his termination, was Dr. McCaslin's alleged

refusal to work with plaintiff. Based on this chronology, plaintiff argues that defendant "decided to throw [him] under the bus in order to appease" Dr. McCaslin "and influence the results of the audit."

It must be noted that the plaintiff is not claiming that he was terminated in violation of public policy. An employer may terminate an at-will employee "for any reason or for no reason." Margiotta v. Christian Hospital Northeast Northwest, 315 S.W.3d 342, 345 (Mo. 2010) (*en banc*). However, the at-will doctrine is limited in certain respects. Id. at 346.

> Under the public-policy exception to at-will employment, an at-will employee may not be terminated (1) for refusing to violate the law or any well-established and clear mandate of public policy as expressed in the constitution, statutes, regulations promulgated pursuant to statute, or rules created by a governmental body or (2) for reporting wrongdoing or violations of law to superiors or public authorities.

Fleshner v. Pepose Vision Inst., P.C., 304 S.W.3d 81, 92 (Mo. 2010) (*en banc*). Plaintiff does not allege that he was terminated for refusing to violate a law or public policy or because he reported such violations to superiors or public authorities. Rather, he contends that defendant's motive in terminating his employment had nothing to do with his "performance" but was solely to appease the leader of the state audit team. Assuming plaintiff could persuade a fact-finder of his version of events, he still cannot prevail on his claim because a termination based on Dr. McCaslin's alleged "dislike" of him is still a termination "for cause."

Viewing the evidence in the record in the light most favorable to plaintiff and giving him the benefit of all reasonable inferences from that evidence, the Court finds that defendant did not terminate plaintiff's employment "without cause" and thus did not breach its contractual obligation to pay him severance benefits. Summary judgment will be entered in favor of defendant on plaintiff's breach of contract claim.

B.  ERISA claims

Plaintiff argues that the December 2010 addendum to the offer letter created a "written severance plan," entitling him to certain protections under ERISA. Defendant states that plaintiff's employment agreement is not a "plan" within the meaning of ERISA.

An employer's decision to extend benefits does not constitute, in and of itself, the establishment of an ERISA plan. Kulinski v. Medtronic Bio-Medicus, Inc., 21 F.3d 254, 256 (8th Cir. 1994). A plan is established for ERISA purposes when a reasonable person can ascertain (1) the intended benefits, (2) the class of beneficiaries, (3) a source of funding, and (4) the procedures for receiving benefits. Petersen v. E.F. Johnson Co., 366 F.3d 676, 678 (8th Cir. 2004).

It is not possible to discern a "class of beneficiaries" from the terms of the December 2010 addendum to the 2007 offer letter. Other evidence in this case establishes that plaintiff's severance benefits constituted an individual contract with terms specifically negotiated with him, rather than a uniform plan offered for the benefit of a class of employees. Kathie Mancini testified that she was "not aware that anyone else [at Molina] has these same severance benefits." [Doc. #62-2 at 74]. Ms. Mancini further testified that "[i]t is not the norm to have a severance benefit at Molina. Most that I am aware of, at the most, are three months." Id.

Plaintiff notes that Ms. Mancini also had a severance benefit and argues that this evidence is sufficient to establish the existence of a plan. However, her severance benefit was triggered only by a change of control and was limited to twelve months. Id. at 72. This evidence establishes only that Ms. Mancini also had a separate, individually-negotiated contract with defendant, not that defendant established a plan

-11-

for a class of employees. "[A]n individual contract providing severance benefits to a single executive employee is not an ERISA employee welfare benefit plan within the meaning of 29 U.S.C. § 1002(1)." Dakota, Minnesota & E. R.R. Corp. v. Schieffer, 648 F.3d 935, 938 (8th Cir. 2011). The severance benefits in the December 2010 addendum do not constitute a "plan" under ERISA and defendant is entitled to summary judgment on plaintiff's ERISA claims.

Accordingly,

**IT IS HEREBY ORDERED** that defendant's motion for summary judgment [Doc. #46] is **granted**.

A judgment in accordance with this Memorandum and Order will be entered.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 1st day of August, 2013.